UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Jesus Carmona,

Plaintiff,

vs.

John Sausen, David Ten Eyck,
David Hermerding, Jennifer Cummings
Tim Friis, Jesse Ventura, Mike Hatch,
Don Inwards, Marshall Prescott,
Rod McCulley, Dick Ross, Harvey (Doe)
and Pete (Doe),

Defendants.

Case No. 00-2447 MJD/RLE

---

Attached as Exhibit A of the Affidavit of Jon K. Iverson is a true and correct copy of *Yeazizw v. City of Edina,* 2004 WL 1966285 (D. Minn. Apr. 28, 2003).

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.
Mebrat Belay YEAZIZW, Plaintiff,
v.
CITY OF EDINA, MINNESOTA (including Edina Police Department and its Chief of Police as chief policy-maker); Jeff Long (in his official and individual capacities); Kris Eidem (in her official and individual capacities); and Troy Kemp (in his official and individual capacities), Defendants.
**No. Civ. 02-524 (RHK/AJB).**

April 28, 2003.
Jill Clark, Jill Clark P.A., Golden Valley, Minnesota, and Jill Waite, Minneapolis, Minnesota, for Plaintiff.

Mark P. Hodkinson and Susan E. Gustad, Bassford, Lackhart, Truesdell & Briggs, P.A., Minneapolis, Minnesota, for Defendants.

MEMORANDUM OPINION AND ORDER

KYLE, J.

Introduction

*1 This civil rights lawsuit arises out of the arrest of Plaintiff, a black woman of Ethiopian national origin, at her former place of employment. Plaintiff Mebrat Belay Yeazizw alleges that the City of Edina ("the City") and three of its police officers (collectively, "the Edina Defendants") violated 42 U.S.C. § 1983 by depriving her of several Constitutional rights, including the rights of substantive and procedural due process, access to the courts, equal protection of the laws, freedom from unreasonable seizure, freedom from false arrest, freedom from prosecution based on fabricated evidence, and her First Amendment right to freedom of expression. Yeazizw also asserts a claim under 42 U.S.C. § 1981 based upon an allegedly racially-motivated misuse of governmental power. She claims a violation of 42 U.S.C. § 1985 based upon an alleged "conspiracy to violate equal protection rights." Furthermore, Yeazizw asserts a *Monell* claim against the City, [FN1] alleging that as a matter of policy and practice it does not adequately discipline, train, or direct its employees regarding the rights of citizens.

FN1. *See Monell v. New York City Dep't of Soc. Servs.,* 436 U .S. 658, 694 (1978) (holding that municipal liability under 42 U.S.C § 1983 is limited to actions occurring pursuant to an official policy or custom).

In addition to these federal claims, Yeazizw asserts several state law claims against the Edina Defendants, including discrimination in the provision of public services or public accommodations and retaliation (all in violation of the Minnesota Human Rights Act ("MHRA"), Minn.Stat. §§ 363.01 *et seq.*), intentional infliction of emotional distress, and violations of the Minnesota State Constitution. Finally, Yeazizw alleges that Defendant Jeff Long aided and abetted others in violating the MHRA.

Before the Court are the Edina Defendants' motion for summary judgment. For the reasons set forth below, the Court will grant the motion as to the federal claims and decline to exercise supplemental jurisdiction over the state law claims.

Background

I. The Parties

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A. The Plaintiff

Yeazizw, a thirty-nine year old woman, was born and raised in Ethiopia. She came to the United States at the end of 1989 (Clark Aff. Ex. *16 at 76 (Yeazizw Trial Test.)), and has resided in Minnesota since at least sometime in 1996 (*see* Gustad Aff. Ex. U at 13 (Pl.'s Answers to Interrogs.)). Between 1996 and 1999, she earned a high school degree by taking classes at the Hope Center in Saint Paul. (Gustad Aff. Ex. U at 13.) During that same time period, she took English-as-a-Second-Language classes at both the Hope Center and Central High School in Saint Paul and, in 1997, received training as a Nursing Assistant from the International Institute in Saint Paul. (*Id.*) Among the various jobs she has held, several have been as a nursing assistant. (*Id.* at 2-4.)

On December 12, 2000, Yeazizw began work at English Rose Suites, a private residential facility for women with dementia and Alzheimer's disease, operated by Roseate, Inc. (*See* Clark Aff. Ex. 16 at 232 (Clairmont Trial Test.) She signed an "Employment Acknowledgment" form on December 12, indicating that she had received an employee handbook. (Clark Aff. Ex. 6 (Roseate, Inc., Employment Acknowledgment form).) On the signature line, Yeazizw added a notation: "Only I don't like dogs. I will not to take care of the dog." ( *Id.*) On January 12, 2001, Roseate fired Yeazizw after she refused to wash a dog due to her cultural and religious beliefs. (Gustad Aff. Ex. U at 3.)

B. The Edina Defendants

***2** Jeff Long is presently a lieutenant with the Edina Police Department. On January 18, 2001, Long was a sergeant, working as a shift supervisor. ( *See* Gustad Aff. Ex. L at 110 (Siitari Dep.).) Long has received forty hours of first responder training and 120 hours of emergency medical technician training. (Gustad Aff. Ex. F at 420-21 (Long Trial Test.).) Long is a white male.

Officer Kris Eidem, a police officer with over twenty years of experience, was working on January 18, 2001, as a patrol officer. Eidem is a white female. (*See* Yeazizw Aff. ¶ 8.) Riding with Officer Eidem that day was Officer Troy Kemp, a rookie who had started with the Edina Police Department a little more than one month earlier. Officer Kemp is a white male. (See Yeazizw Aff. ¶ 8 .) On January 18, 2001, Officer Eidem was overseeing field training for Officer Kemp. (Gustad Aff. Ex. H at 159 (Kemp Trial Test.).)

II. Events at the English Rose Suites

Sometime between 2:00 p.m. and 3:00 p.m. on January 18, 2001, Yeazizw went to English Rose Suites to pick up her final paycheck. (Clark Aff. Ex. 16 at 247 (Clairmont Trial Test.).) Geralyn Mornson, one of the owners, had told Yeazizw to bring her employee handbook with her so that she could return it before she received her paycheck. [FN2] (Gustad Aff. Ex. K at 71-72 (Mornson Dep.).) Yeazizw looked at her check and objected that she had worked more hours than it reflected. ( *Id.* at 66-67; Emde Aff. ¶ 7.) Yeazizw and Mornson went to the lower level of the house so that Mornson could check her payroll records. (Gustad Aff. Ex. K at 66-67; Emde Aff. ¶ 7; *see also* Clark Aff. Ex. 16 at 183.) According to Jayne Clairmont, the other owner of the business, while Yeazizw and Mornson were in the "octagon room" on the lower level, Yeazizw repeatedly raised her voice. (Clark Aff. Ex. 16 at 184-85.) Clairmont testified that she came out of her office on several occasions to tell Yeazizw to lower her voice because of the residents with dementia living upstairs. (*Id.* at 187-88, 190, 192-93; *see also* Emde Aff. ¶ 9.)

FN2. Yeazizw asserts that, when she went to English Rose Suites on January 18, 2001, "she did not know that Mornson suffered from mental illness or that Mornson has had psychotic episodes." (Pl.'s Mem. Opp'n Mot. for Summ. J. at 3 (hereinafter "Pl.'s Mem.") No evidence before the Court establishes that Mornson either was psychotic or was prone to psychotic episodes on January 18, 2001, let alone that she was experiencing a psychotic episode when the events in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 3



question took place. With the exception of Mornson's testimony that she was taking Zoloft, an anti-depressant, on January 18, 2001, (*see* Gustad Aff. Ex. K at 73), all of the evidence regarding Mornson's mental health pertains to events occurring more than fourteen months *after* the events at English Rose Suites that underlie Yeazizw's claims.

Accounts of what eventually happened in the "octagon room" differ markedly. Yeazizw alleges that Mornson flew into a rage after she recalculated Yeazizw's hours and saw that Yeazizw was correct; she threw the calculator at Yeazizw, cutting her arm. (Clark Aff. Ex. *16 at 99-100, 199 (Yeazizw Trial Test.); Yeazizw Aff. ¶ 8.)

Q. Okay. And how much were you bleeding when you looked at your arm?

A. My clothes was white, very white, and when I have a look at it it's too much.

Q. Okay. It's too much?

A. I see too much blood, yeah.

(Clark Aff. Ex. *16 at 105.) [FN3] Yeazizw further claims that, after Mornson hit her with the calculator, Clairmont and another employee restrained her, preventing her from calling 911. [FN4] (Id. at 106-09; Yeazizw Aff. ¶ 8.) Yeazizw also claims that, after Mornson pulled the telephone out of Yeazizw's reach, she pulled the large gold earrings from Yeazizw's ears. [FN5] (Clark Aff. Ex. *16 at 108, 111.)

FN3. With respect to this trial testimony, Yeazizw has subsequently averred as follows:

At the criminal trial, I struggled to explain the amount of blood. I said it was "too much" blood. Then I clarified by showing visually what I meant, but that is not clear from the transcript. I have since learned my words "too much" would be like saying "noticeable." In Ethiopia, we say "too much," especially when the blood is on white clothes, because if it is noticeable, it is "too much" blood on your clothes to wear them that way.

(Yeazizw Aff. ¶ 8.) The Court notes that Yeazizw was testifying through an interpreter.

FN4. The parties differ as to whether there was a telephone on the table in the octagon room. Yeazizw testified at her criminal trial that there was a black telephone on the table, and that a long cord ran from Jayne Clairmont's office to that phone. (Clark Aff. Ex. *16 at 96 (Yeazizw Trial Test.).) Clairmont testified that there was no phone in the octagon room and that Mornson had to leave the table and go to the adjacent office area in order to get a phone and call 911. (Clark Aff. Ex. 16 at 194-96 (Clairmont Trial Test.).)

FN5. Yeazizw was unclear in her testimony as to whether both earrings were pulled off or just one. Initially she testified that Mornson pulled off both earrings (Clark Aff. Ex. *16 at 108), but, following the afternoon recess, she testified that just one earring had been pulled off and that, as a result, the hole in that earlobe had became stretched (*id.* at 111- 12.)

*3 In contrast to Yeazizw's version, the individuals at English Rose describe a different sequence of events. Clairmont testified that she repeatedly promised Yeazizw that she would look into the discrepancy in hours on Yeazizw's paycheck. (Clark Aff. Ex. 16 at 192-94.) Clairmont also testified that she repeatedly asked Yeazizw to leave because she was being disruptive, but that Yeazizw refused to go without her money. [FN6] (Clark Aff. Ex. 16 at 192-94; see also Emde Aff. ¶¶ 10-11.) Clairmont denies that anyone threw a calculator at Yeazizw or that she was bleeding. [FN7] (Clark Aff. Ex. 16 at 200.)

FN6. Laurie Emde, an employee of English Rose Suites, avers that at some point Clairmont went up to Yeazizw and tried to put her hand over Yeazizw's mouth. (Emde Aff. ¶ 15.) Emde also states that Clairmont grabbed Yeazizw's arm and tried to pull her up the stairs. (*Id.*)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 4



Emde further avers that Clairmont asked her to help with Yeazizw, but she refused. (*Id.*) Clairmont let go of Yeazizw, who sat down again. (*Id.*)

FN7. Emde also saw Mornson grab the employee handbook that Yeazizw had brought with her and take it to a back room on the lower level. In that back office, Emde saw that

Ms. Mornson was holding the handbook and Ms. Yeazizw had her hands on either end of it, and Ms. Mornson let go of it and Ms. Yeazizw's hands flew backwards and it knocked the earring out of her ear and she bent down to pick it up, and she said "[M]y gold, my gold," then we all went back into the room at the bottom of the stairs. Ms. Yeazizw also retrieved the handbook. She was upset. Ms. Mornson was also upset.

(Emde Aff. ¶ 12.)

One of the owners of English Rose Suites ultimately called 911 and asked the police to remove Yeazizw. [FN8] (*See* Clark Aff. Ex. 16 at 194-96.)

FN8. Yeazizw testified that Clairmont was restraining her around her waist after the calculator-throwing incident, and that it was Clairmont who called 911. (Clark Aff. Ex. *16 at 109-10, 150, 202 (Yeazizw Trial Test.).) On cross-examination, the prosecutor asked Yeazizw whether Clairmont was wrong when she testified that it was *Mornson* who had called 911; Yeazizw responded that Clairmont was wrong. (*Id.* at 201.)

Q. So Miss Clairmont had her hands around your waist holding you?

A. Yes. Yes.

Q. And she was still able to use the telephone to call 911 from around your body?

A. Yes.

(*Id.* at 202.)

III. The Police Arrive at English Rose Suites

At about 3:07 p.m., Officer Eidem (with whom Officer Kemp was riding) and Officer Abigail Hammond, as backup, responded to a call from the dispatcher regarding a disturbance at the English Rose Suites involving an employee who was out of control, yelling, screaming, and banging things around. (Clark Aff. Ex. 5 (Edina Incident Dispatch Detail Report); *see also* Gustad Aff. Ex. C at 42 (Hammond Dep.).) Officers Eidem, Kemp, and Hammond arrived at the property at about 3:15 p.m., and proceeded to the "octagon room" on the lower level of the house. (*See* Clark Aff. Ex. 5; Gustad Aff. Ex. A at 39 (Eidem Dep.).) The parties' accounts of what happened next again differ in several respects.

A. Yeazizw's Account

According to Yeazizw, as soon as the police arrived, Mornson grabbed her purse and left, and Clairmont told Mornson, "Don't worry, I will take care of her." [FN9] (Clark Aff. Ex. *16 at 121 (Yeazizw Trial Test.).) When the officers came downstairs, the male officer went directly to Yeazizw, who was still being restrained by Clairmont. (Clark Aff. Ex. *16 at 116 (Yeazizw Trial Test.).) Clairmont handed Yeazizw over to Officer Kemp, who immediately pulled both hands behind Yeazizw's back and handcuffed her. (*Id.* at 116, 123.) After she was handcuffed, the police put their arms under Yeazizw's armpits and dragged her up the stairs. [FN10] (*Id.* at 117.)

FN9. In opposing summary judgment, however, Yeazizw now avers that when the police were downstairs in the basement: I tried to tell police what had happened to me. I repeatedly started my story, but was told to "shut up" and be quiet. I told them, "She taking my gold." That was how I tried to explain that Mornson had snatched my earring out of my ear. I also said "She hit me" and "She hurt me." *I pointed at Mornson when I said it.* That was how I tried to explain that Mornson had thrown a calculator at me.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Yeazizw Aff. ¶ 11 (emphasis added).)

FN10. In her affidavit opposing summary judgment, Yeazizw avers that two police officers

dragged me up the basement stairs, face down. It hurt my shoulders. My gauzy dress tore, and my knees were scraped. I had no control over my legs, and they bounced on the way up. For awhile [sic], Clairmont grabbed a leg, then dropped it.

(Yeazizw Aff. ¶ 12 (emphasis added).) In the booking room at the station, Yeazizw did not show Long that her knees had been scraped up during her arrest, and later, when asked at the Hennepin County Adult Detention Center whether she had been injured during the last twenty-four hours, she did not identify any injuries to her lower extremities.

According to Yeazizw, as she was being dragged out of the building, Yeazizw was yelling in Amharic, English, and Arabic, "She took my earring, my gold, she took my earring." (*Id.*) Yeazizw testified that a short, thin, female officer told her twice to "shut up," and that the other female officer told her to "be quiet." (*Id.* at 118.) Yeazizw further testified that none of the officers asked Yeazizw to tell her side of the story in the basement, and none of them asked her to leave the building: "They were there. They were talking. I didn't understand anything that they were saying. Nobody told me to leave." (*Id.*)

Yeazizw said that, in frustration, she told the officers that the only reason they were arresting her was because she was black, to which one of the female officers allegedly responded, "Then if you know that you are a black person, why did you come to this country?" [FN11] (*Id.* at 122.) Yeazizw denies struggling with or resisting the officers.

FN11. For purposes of this motion, the Court accepts as true Yeazizw's account of what the officers said to her. The officers deny making such statements to Yeazizw.

B. The Edina Defendants' Account

***4** According to the Edina Defendants, when the officers arrived on the scene, Yeazizw appeared upset and was raising her voice. (Gustad Aff. Ex. G at 158 (Kemp Dep.).) Officer Eidem talked to each of the people in the room to determine what had been going on. (*See* Gustad Aff. Ex. B at 278-79 (Eidem Tr. Test.).) Officer Kemp took Yeazizw's driver's license and radioed in to the station to check for outstanding warrants. (Clark Aff. Ex. 17 at 190-91 (Eidem Dep.).) Officer Kemp observed that Yeazizw did not seem to be speaking exclusively English; some of the time she appeared to speak a foreign language. (Gustad Aff. Ex. G at 158.) Yeazizw was stating in a louder-than-conversational tone of voice that she needed her money and had been shorted on hours. ( *See id.* at 177-78.)

The Edina Defendants allege that the owners of the property told Officer Eidem that they wanted Yeazizw to leave. (Gustad Aff. Ex. A at 90 (Eidem Dep.).) Yeazizw responded that she was not going to leave without her money. (Gustad Aff. Ex. B at 279-80.) At some point, Yeazizw also told Officer Eidem that an earring had been ripped out of her ear. (Gustad Aff. Ex. A. at 69-70; Clark Aff. Ex. 16 at 534 (Eidem Trial Test.).) When Officers Eidem and Hammond told Yeazizw that she would have to pursue the paycheck dispute in a civil lawsuit and would have to leave the premises, Yeazizw responded by reiterating that she needed her money. (Gustad Aff. Ex. A at 43; *id.* Ex. G at 185, 192-95.) At some point, Officer Hammond gave Yeazizw a blue card describing options for pursuing a civil claim. (*See* Emde Aff. ¶ 16.)

Officer Eidem again told Yeazizw that she needed to leave or she would be arrested for trespassing. (Gustad Aff. Ex. A at 45.) Yeazizw refused to get up from the chair she was sitting on. (*Id.* at 45, 87-88; Gustad Aff. Ex. B at 280-81.) Officer Eidem and Officer Hammond stood on either side of Yeazizw's chair and again told Yeazizw that she had to leave the premises now. (Gustad Aff. Ex. B at 283-84.) When Yeazizw would not stand up on her own, each officer took an arm and began to lift her

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to her feet. (*Id.* at 285.) After Yeazizw was standing, the two female officers placed Yeazizw in an escort hold [FN12] and led her up the stairs. [FN13] (Gustad Aff. Ex. A at 96-98.)

FN12. An escort hold involves the officer grasping a subject's forearm with one hand and placing his or her other hand against the subject's shoulder blade.

FN13. The officers and owners of English Rose Suites testified in the criminal trial that Yeazizw was yelling and/or screaming after the police arrived and as they tried to lead her out of the house. (*See. e.g.,* Clark Aff. Ex. 16 at 210 (Clairmont Trial Test.); *id.* at 457 (Kemp Trial Test.); *id.* at 471, 475-79 (Eidem Trial Test.); Clark Aff. Ex. *16 at 9, 15 (Hammond Trial Test .)). Emde avers that she heard no ear-splitting screams from Yeazizw (Emde Aff. ¶ 21), and that, while the police were present, Yeazizw's words "escalated," but she was not screaming (*id.* ¶ 16.)

According to the officers, partway up the stairs, Yeazizw began resisting their efforts to lead her out of the house. (Gustad Aff. Ex. B at 286; Clark Aff. Ex. 16 at 476 (Eidem Trial Test.); *id.,* Ex. *16 at 41 (Hammond Trial Test.).) The officers arrested her and placed handcuffs on her at the top of the stairs. (Gustad Aff. Ex. B at 287; Gustad Aff. Ex. C at 104 (Hammond Dep.).) At some point on the way out of the house, Yeazizw said to the officers that she was being arrested because she is black. (*See* Clark Aff. Ex. 16 at 447 (Eidem Trial Test.).)

IV. The Officers Take Yeazizw to the Police Station

Edina Police brought Yeazizw to police headquarters at 4:06 p.m. (Clark Aff. Ex. 11 at 2 (Long Position Statement to Dep't of Human Rights).) Once the police removed the handcuffs, Yeazizw began to ask repeatedly to see the chief of police. (Gustad Aff. Ex. O at 1-6 (Scales Tape Tr.).)

*5 Officer Kemp read Yeazizw her *Miranda* rights in full; Yeazizw responded that she did not understand what he had read to her. (*Id* . at 4-5.) Officer Eidem then began to go through the *Miranda* rights with Yeazizw again--sentence by sentence--asking her what she did not understand. Officer Eidem went no farther than the right to remain silent, however, stopping when, in response to several questions to Yeazizw about what she did not understand, Yeazizw would only respond that she wanted to see the chief of police and would tell him everything. (*Id.* at 5.)

Officer Eidem spoke to Long before he entered the interview room to meet with Yeazizw. (Gustad Aff. Ex. E at 140 (Long Dep.).) In response to Yeazizw's requests to see the chief of police, Long responded that he was Officer Eidem's supervisor. Yeazizw showed Long a mark on her arm and said that one of the women at English Rose Suites had done that to her. (Gustad Aff. Ex. O at 15.) Long looked at the cut and, not seeing any dried blood on her arm or blood on her clothes or bright red scabbing, concluded that the wound was not new. (Gustad Aff. Ex. E at 200; *id.* Ex. O at 15, 17-18.) Yeazizw did not point out to Long any blood on her clothing. (*See* Gustad Aff. Ex. O at 15-20.) When Long told Yeazizw that the mark on her arm was healing and was not fresh, Yeazizw insisted it was from that day. (Gustad Aff. Ex. O at 15.)

[Long] ... Those people that ... your employer ... your boss did that?
[Yeazizw] Yeah.
[Long] Trying to get you to leave.
[Yeazizw] But not like that.
[Long] Well, why didn't you leave?
[Yeazizw] And then why did she taking my ear.
[Long] Why didn't you leave? Why didn't you just leave?
[Yeazizw] Huh?
* * * * *
[Long] Why did you not leave? Why didn't you leave? When they said good-bye, leave, go away, why didn't you go ...
[Yeazizw] But I want my money. I work, uh, for it.

(Gustad Aff. Ex. O at 16.)

Yeazizw ultimately complained to Long that she

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

had been arrested because she is black. (Gustad Aff. Ex. O at 19-20; Gustad Aff. Ex. E at 139 (Long Dep.).) Long responded, "If anyone fights with the police department, they go to jail. I don't care if they're white, black, Asian, or purple. They go to jail." (Gustad Aff. Ex. O at 19 .) When Yeazizw began to respond to that statement, Long said "If you're gonna start dropping a race card on me ... that you're in jail because ... it's because of your color, then we're done talking. 'Cuz that's not reasonable." (*Id.*) Shortly thereafter, Long ended his discussion with Yeazizw. (*Id.* at 20.)

While waiting for someone from Hennepin County to transport her to the Adult Detention Center, Yeazizw told Officer Kemp that when Mornson added up the hours and saw that Yeazizw had been correct, she got angry and said she would call the police:

[Yeazizw] ... And then she grabbed me and said ...
***6** [Kemp] Who was that?
[Yeazizw] The girl. She grabbed me.
[Kemp] OK. What is the ...
[Yeazizw] She grabbed me ...
[Kemp] ... uh ...
[Yeazizw] ... and then she take my ear ... earring and my ear of my gold.
[Kemp] What's the phone number there? At that house?

(Gustad Aff. Ex. O at 29-30.) [FN14]

FN14. At Yeazizw's criminal trial, Officer Kemp acknowledged that he had been paying more attention to filling out the arrest forms than to Yeazizw's version of what had happened. (Clark Dep. Ex. 16 at 346 (Kemp Trial Test.).)

At 5:47 p.m., Yeazizw was transported from the Edina Police Department to the Hennepin County Jail. (Clark Aff. Ex. 11 at 2.) There, she was charged with gross misdemeanor obstruction of legal process, misdemeanor obstruction of legal process, and disorderly conduct. (*See* Gustad Aff. Ex. F at 425 (Long Trial Test.); Gustad Aff. Ex. S at 2 (Nov. 13, 2001, Mem. Order, *State v. Yeazizw,* Hennepin Cty. Court Case No. 01014419).)

For the intake form at the Hennepin County Adult Detention Center, Yeazizw answered affirmatively the question "Have you been injured in the past twenty-four hours?" Yeazizw indicated that she had scratches on her right arm. (*See* Clark Aff. Ex. *16 at 171 (Pedersen Trial Test.).) The bottom section of the form asks a Hennepin County employee to describe any visible injuries. The notation made on Yeazizw's form was "NV," which means "no visible injuries." (*Id.* at 171-72.) Nor is there any reference on the form to blood on Yeazizw's clothing.

V. Yeazizw's State Court Prosecution

On February 14, 2001, prosecutors filed a criminal complaint against Yeazizw in Hennepin County District Court. (Clark Aff. Ex. 12 at 2 (Crim Compl., *State v. Yeazizw,* Hennepin Cty. Court Case No. 01014419); Gustad Aff. Ex. Q at 1 (Hennepin County Crim. Docket) .) The same counsel who represent Yeazizw in this case also represented her for the majority of the criminal proceedings in Hennepin County.

Yeazizw filed a "Motion to Dismiss for Discriminatory Enforcement and Other Unconstitutionality" alleging that, as a member of several protected classes, [FN15] she suffered adverse action at the hands of the police, including but not limited to the following:

FN15. Yeazizw asserted in the supporting memorandum filed in her criminal proceedings that her race is black, her national origin is Ethiopian, she is a person of color, she has a disability in that she suffers from post traumatic stress disorder, and she is handicapped in communication because she does not speak English fluently and her English deteriorates in times of stress. (Gustad Aff. Ex. R at 1-2. (Yeazizw's Mem. Supp. Mot. to Dismiss for Discriminatory Enforcement and Other Unconstitutionality).)

d she was the only person of color present, and the only one the police suspected of wrongdoing, [FN16]

FN16. Yeazizw also asserted that she was bleeding at the scene. (*Id.* at 3.)

d she was never interviewed by police at the scene or at the police station,
d she was not allowed to make a formal complaint against the white women whom she alleged assaulted her,
d she was not provided with an interpreter (despite having told police that she did not understand the *Miranda* rights they read her), and
d she was ignored by the police when she complained that the only reason she was being arrested was because she is black.

(Gustad Aff. Ex. R. at 3-4 (Yeazizw's Mem. Supp. Mot. to Dismiss for Discriminatory Enforcement and Other Unconstitutionality).) Yeazizw argued that she was denied procedural due process because the police failed to make an independent investigation and instead relied upon the word of the complainant. (*Id.* at 6.) Yeazizw further contended that, because of the police's failure to afford procedural due process, no probable cause existed prior to the arrest. (*Id.* at 6-7.) In addition, Yeazizw argued to the state court that the police's "failure to interview her to determine that she was in fact the victim, rousting her, arresting her, refusing her an interpreter, failing to understand or even investigate her post traumatic stress disorder reaction, should shock the conscience of this court" and give rise to a finding of a substantive due process violation. (*Id.* at 8.) Finally, Yeazizw asserted that the disorderly conduct and obstruction of legal process statutes were unconstitutionally vague. (*Id.* at 12-17.)

*7 Hennepin County District Judge Allen Oleisky heard Yeazizw's motion on October 19, 2001. (*Id.* at 2.) Following the hearing, Yeazizw filed a supplemental memorandum in support of her motion. (Gustad Aff. Ex. Q at 2.) By an Order dated November 27, 2001, Judge Oleisky denied the motion to dismiss. (Gustad Aff. Ex. Q at 2.) Rejecting Yeazizw's allegations of discriminatory enforcement, the district court concluded that the police

> arrested the defendant because of her actions while in their presence. She was belligerent, refused to obey the officer's instructions, and physically resisted the officers. She had not demonstrated that she was singled out for enforcement or that her selection was in bad faith. Further, she has not introduced any evidence to support her claim that she specifically was arrested because of her race, color, creed, or any other reason unrelated to her conduct. Because the defendant had made only a general, conclusory allegation that discriminatory enforcement occurred in her arrest, she does not merit a hearing on that issue.

(Gustad Aff. Ex. S at 4.) Similarly, the district court concluded that Yeazizw's assertions of discriminatory prosecution were conclusory and did not raise a reasonable doubt as to the State's motive in charging her. (*Id.* at 5.) The district court also rejected Yeazizw's contention that there was no probable cause to support the charges against her. ( *Id.* at 7.)

Finally, Judge Oleisky addressed Yeazizw's argument that the City had violated her due process rights by erasing the tape on which Mornson's 911 call had been recorded. (*Id.* at 5.) Yeazizw asserted that the recording, if it still existed, would prove that she herself was the true victim of a crime; she claimed that the tape would establish that she was screaming for help in the background because she was being physically restrained by two English Rose employees. (*Id.* at 5-6.) Judge Oleisky concluded that Yeazizw had established that the City intentionally destroyed the 911 tape, in that the police department had followed its standard policy of recycling its tapes. (*Id.* at 6-7.) The district court held, however, that Yeazizw had not shown that the tape was destroyed in bad faith. (*Id.* at 7.) The court further held that Yeazizw had not established the exculpatory value of the evidence on the tape: "The factual basis for the charges against the defendant are her actions while in the presence of the Edina Police officers, not any behavior before the police arrived on the scene." (*Id.*)

On March 18, 2002, Yeazizw moved for "Special Assignment and Continuance of Trial and for an Opportunity for the Defendant to Bring a Motion for Reconsideration." (*Id.* at 4.) The district court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appears to have denied that motion the same day and ordered the parties to appear for trial beginning April 9. On April 1, 2002, Yeazizw brought a motion seeking disqualification of the prosecutor's office based on a conflict of interest. (*Id.* at 5.) The district court denied that motion on April 1, 2002. ( *Id.* at 6.)

***8** Also on April 1, 2002, Yeazizw filed a motion for a continuance and additional discovery. (Gustad Aff. Ex.Q at 6.) The court granted Yeazizw's request for a continuance but denied her request for additional discovery. (*Id.* at 7.) Yeazizw's lead counsel then sought a further continuance of the trial due to medical issues; that request was also granted. (*Id.* at 8.)

Yeazizw's criminal trial before Hennepin County District Judge Dufresne began on May 28, 2002. (Gustad Aff. Ex. Q at 9.) At the trial, Yeazizw testified as set forth in the previous sections of this Background section. Yeazizw also presented evidence that Officer Kemp had prepared multiple drafts of the police report containing different details regarding the incident at English Rose Suites. (Gustad Aff. Ex. Y.) From the evidence of those drafts, Yeazizw argued that the police reports contained fabricated evidence that had been added to the original report in order to bolster the State's prosecution.

On June 5, 2002, the jury deliberated and returned verdicts of guilty on all three counts of the Indictment. (*Id.* at 10; Gustad Aff. Ex. T (Verdicts of Guity, *State v. Yeazizw,* Hennepin Cty.Crim. No. 01014419).) On August 21, 2002, the district court sentenced Yeazizw to 180 days of incarceration, staying for a period of two years 175 days of that term of confinement. [FN17] (Gustad Aff. Ex. Q at 12.) In addition, the district court fined Yeazizw $1,000.00, but stayed that fine for a period of two years. The court also ordered Yeazizw to undergo anger management counseling and psychotherapy. ( *Id.*)

FN17. Yeazizw received two days' credit for time already served; thus, the court ordered her to spend three days in the workhouse.

Yeazizw filed a notice of appeal on September 3, 2002. (*Id.* at 13.) Among the issues she raises on appeal is that the jury improperly evaluated her credibility based on extraneous matters occurring outside the courtroom. A juror allegedly observed Yeazizw speaking in English at times to her lawyers and to individuals in the hallway and allegedly pointed out that fact to the rest of the panel; from that fact, the jury allegedly concluded that, because Yeazizw was "lying" about her need for an interpreter, she was lying about what happened on January 18, 2001. (*See* Clark Aff. ¶ 11.)

## Analysis

### I. Standard of Decision

Summary judgment is proper when, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex v. Catrett,* 477 U.S. 317, 325 (1986). The court must view the record in the context of the legal issues involved in the lawsuit. The mere existence of an alleged factual dispute will not defeat a properly supported summary judgment motion; rather, the dispute must be *genuine. Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; Matsushita Elec. Indus. v. Zenith Radio,* 475 U.S. 574, 587 (1986). "As to materiality ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby,* 477 U.S. at 248. The moving party bears the burden of showing that the material facts in the case are undisputed. *See Celotex,* 477 U.S. at 322; *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.,* 224 F.3d 735, 738 (8th Cir.2000). Where the moving party meets its initial burden, the nonmoving party may not rest on mere allegations or denials, but must show that specific facts exist giving rise to a genuine issue for trial. *See Liberty Lobby,* 477 U.S. at 256; *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir.1995).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*9 This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over those claims brought under the federal civil rights statutes--42 U.S.C. §§ 1981, 1983, and 1985. It has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over Yeazizw's state law claims. The Court begins its analysis with Yeazizw's federal claims.

II. Plaintiff's Federal Civil Rights Claims

Yeazizw argues that the following conduct has caused the constitutional injuries that underlie her claims pursuant to 42 U.S.C. §§ 1981, 1983 and 1985: [FN18]

FN18. In a letter submitted after oral argument on the Defendants' motion, Yeazizw argues that the Defendants have not moved for summary judgment on "claims" arising out of a second criminal complaint that charged her with making terroristic threats. Yeazizw asserts that prosecutors dropped those charges shortly after they were brought, and contends that the second criminal complaint was made in bad faith to harass her. (*See* First Am. Compl. ¶¶ 55-64.) Yeazizw has offered no admissible evidence establishing that the Edina Defendants caused a second criminal complaint to be filed against her. The second complaint is not before the Court, nor is there evidence that it was later dropped. Yeazizw cannot rest on allegations made in her First Amended Complaint; to avoid summary judgment, she must present competent evidence giving rise to genuine issues of material fact. With respect to these claims, she has not done so.

Officers Eidem, Kemp, Hammond, and Long "willfully acted individually, and in concert, to fabricate testimonial and non-testimonial evidence, including police reports and depositions, and conspired to cover up for police misconduct." (Pl.'s Mem. at 17 .) Thus, they deprived Yeazizw of (1) substantive due process; (2) the right to be free from an unreasonable seizure; (3) the right to be free from a baseless, wrongful, and/or retaliatory prosecution; (4) access to the courts; and (5) equal protection of the laws. (*See id.* at 17-18.)

Because Yeazizw complained that she was being arrested because she is black, Officer Eidem arrested her and sought permission from Long to charge her with a gross misdemeanor. (Pl.'s Mem. at 18-19.) Furthermore, again because Yeazizw complained that she had been arrested because she is black, Officer Long intimidated her, refused to listen to her complaints against the English Rose women for assault, sent her to jail, and referred the final police report to the prosecutors. (*Id.* at 19.) Yeazizw contends that, thus, she has been retaliated against for engaging in protected speech and petitioning government for redress of grievances. (*See id.* at 19.)

The officers at the scene treated Yeazizw, a black woman, differently than the white women at English Rose Suites. The white women were given "preferential treatment" (Pl.'s Mem. at 18 n. 31) - that is, "prompt and one-sided service." (*See id.* at 20-21.) "Yeazizw was presumed the perpetrator. She was not allowed to explain to police at the scene, although she tried to tell them she was the victim. They didn't care and wouldn't listen. She was not given an interpreter, which might have put her on a more level playing field with the [English Rose Suites] women." (*Id.* at 20 .) Furthermore, the police violated Yeazizw's equal protection rights because they "were doing the bidding of the [English Rose Suites] women rather than acting as neutral fact-finders." (*Id.* at 23 n .41.) Thus, Yeazizw alleges that, because she was black, she was seized without probable cause, was subjected to "force," [FN19] was denied the right to make a cross-complaint, and was denied an investigation of her complaints against the women at English Rose Suites. (*See id.* at 20-21.)

FN19. Yeazizw is not, however, claiming a constitutional injury based on the use of "excessive force" in violation of the Eighth Amendment. (Pl.'s Mem. at 1 n. 2.)

Yeazizw complains that she was deprived of her

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

right to be free from an unreasonable, warrantless seizure and false arrest. (Pl.'s Mem. at 21.) "[B]y Eidem's own admission, Yeazizw was sitting in a chair and merely talking to officers, when Eidem (and Hammond) decided to use force to eject Yeazizw." [FN20] (*Id.* at 22.) Yeazizw argues that she had not committed criminal trespass and complains that the officers at the scene made "absolutely no investigation into and [had] no evidence that Yeazizw lacked a 'claim of right' to remain on the property." (*Id.* at 22.) Yeazizw contends that "Eidem did not even have the right to order Yeazizw to leave, and doing so was not a legal order." (*Id.* at 23.)

FN20. Yeazizw's own account of events at English Rose Suites after the police arrived never place her "sitting in a chair and merely talking to officers." Her sworn testimony at trial was that Clairmont, who was restraining her, *immediately* handed her over to Officer Kemp when the police came downstairs, and that Officer Kemp *immediately* pulled Yeazizw's arms behind her back and handcuffed her.

***10** Yeazizw further argues that the officers lacked probable cause to seize her for obstructing legal process. (Pl.'s Mem. at 23.) "Eidem would have us believe that simply because Yeazizw did not immediately do everything that Eidem told her to do, that she had a right to seize her under [obstructing legal process]. But police cannot manufacture probable cause by giving an order without a legal basis, and then arresting the person who defies it." (*Id.*) Yeazizw contends that all of her "physical conduct can be explained by the fact that she was being dragged up the stairs. It is not reasonable for an officer to jostle someone up a narrow basement staircase and then arrest them for jostling, because there is no evidence of intent (a necessary element for [obstrucing legal process].)" (*Id.* at 23-24.)

As a threshold matter, this Court must consider the relationship between Yeazizw's federal civil rights claims and her state criminal proceedings.

A. Section 1983

The Edina Defendants contend that Yeazizw's § 1983 claims are precluded by the holding of *Heck v. Humphrey,* 512 U.S. 477 (1994). The Court agrees. In *Heck,* the Supreme Court announced the following rule:

> in order to recover damages for *an allegedly unconstitutional conviction* or imprisonment, or for *other harm caused by actions whose unlawfulness would render a conviction* or sentence *invalid,* a § 1983 plaintiff must prove that *the conviction* or sentence *has been reversed on direct appeal,* expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Heck,* 512 U.S. at 486-87 (emphasis added). [FN21] Thus, the *Heck* rule defines when a § 1983 claim calling into question the validity of a state court conviction is ripe: A plaintiff "has no cause of action under § 1983 *unless and until* the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus." *Id.* at 489 (emphasis added).

FN21. Yeazizw's argument that *Heck* only applies to prisoners is without merit, as the italicized language in the quotation from *Heck* demonstrates. The policy underlying the application of the *Heck* rule applies with equal force to Yeazizw's § 1983 claims, which attack the validity of her state criminal conviction.

A jury convicted Yeazizw in state court of disorderly conduct, obstructing legal process, and gross misdemeanor obstruction. The constitutional injuries that she claims underlie her § 1983 action--set forth above--all go to the validity of that conviction. She has appealed her conviction to the Minnesota Court of Appeals, and, to date, the state appellate court has not decided that appeal. Accordingly, Yeazizw's claims for damages under § 1983 are barred by *Heck.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Yeazizw argues that the *Heck* rule cannot apply to her claims because everything in the state process was tainted by the Defendants' fabrications. (Pl.'s Mem. at 31.) Yeazizw, however, presented the issue of fabrication to the jury in her criminal trial, making that part of the record for appeal. She showed the jury multiple drafts of the police report regarding her arrest and also composed a chart for the jury detailing the changes made from draft to draft. (*See* Gustad Aff. Ex. Y.) From this evidence, she argued that the officers' accounts of the events at English Rose Suites were not credible. On the facts of this case, Yeazizw cannot pursue claims of police misconduct in a § 1983 action until she has first reversed her conviction in state court. *See Moore v. Sims,* 200 F.3d 1170, 1172 (8th Cir.2000) (holding that plaintiff's claim that evidence was unlawfully "planted" was *Heck*-barred and properly dismissed); *Moore v. Novak,* 146 F.3d 531, 535-36 (8th Cir.1998) (holding that plaintiff convicted of assaulting officer was *Heck*-barred from bringing § 1983 claim that officer destroyed or secreted videotape of incident).

***11** Yeazizw also contends that the *Heck* rule does not preclude her from pursuing a claim for injunctive relief under § 1983. Yeazizw has requested "a permanent prohibitory injunction prohibiting Defendants, their officers, agents, employees, and successors, from engaging in the illegal practices complained of herein." (First Am. Compl. at 35, ¶ 5.) In her opposition memorandum, Yeazizw further refines the scope of her requested injunction: "It is precisely to enjoin the malicious conduct claimed here, that Yeazizw seeks an injunction." (Pl.'s Mem. at 32.) She further explains: "Surely defendants will not argue that requiring Edina police to tell the truth, to be unable to utilize the fruits of their fabrication will *interfere* with the state court process. On the contrary, it will assist it." (*Id.* at 32 n. 55 (emphasis in original).) Plainly, in order to award Yeazizw the injunctive relief she seeks, a fact-finder in federal court must find "illegal"--*i.e.,* unconstitutional--the conduct she has complained of vis-a-vis her arrest and prosecution. This is conduct for which she seeks money damages. The court will not elevate form over substance--*Heck* applies to Yeazizw's § 1983 claim in its entirety. [FN22] *See Sheldon v. Hundley,* 83 F.3d 231, 233 (8th Cir.1996) (indicating that, under *Heck,* the court disregards the form of relief sought and instead looks to the essence of the plaintiff's claims.) Yeazizw's § 1983 claims will be dismissed without prejudice.

FN22. In addition to concerns arising under *Heck,* the Court notes that it is well-established in this circuit that, "where a plaintiff seeks equitable relief, [s]he must demonstrate that [s]he lacks an adequate remedy at law and that absent injunctive relief [s]he will suffer irreparable harm." *Bonner v. Circuit Court of St. Louis, Mo.,* 526 F.2d 1331, 1336 (8th Cir.1975). Yeazizw does not satisfy this standard in either respect; she has pleaded monetary damages with respect to her federal civil rights claims, and has presented no evidence establishing that, absent an injunction, she will suffer *irreparable* harm. Yeazizw's state court conviction is very much an open question, and she preserved numerous constitutional issues in the trial court. "Congress and the federal judiciary have consistently recognized that federal courts should permit state courts to try state cases, and that where constitutional issues arise, state court judges are fully competent to handle them subject to Supreme Court review." *Id.*

B. Sections 1981 and 1985

In correspondence submitted to the Court after oral argument, Yeazizw raised the issue of whether the *Rooker-Feldman* doctrine applied to this action, and urged the Court to conclude that it does not operate to bar consideration of her claims. The parties have previously briefed the applicability of the doctrine to the Court. In any event, because the *Rooker-Feldman* doctrine is jurisdictional, the Court may consider it *sua sponte. Lemonds v. St. Louis County,* 222 F.3d 488, 492 (8th Cir.2000), *cert. denied sub nom. Halbman v. St. Louis County,* 121 S.Ct. 1168 (2001).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"The *Rooker-Feldman* doctrine recognizes that, with the exception of habeas corpus petitions, lower federal courts lack subject matter jurisdiction over challenges to state court judgments ." *Id.* "*Rooker-Feldman* is based squarely on federal law and is concerned with federalism and the proper delineation of the power of the lower federal courts. Such courts are simply without authority to review most state court judgments--regardless of who might request them to do so." *Id.* at 495. "The *Rooker-Feldman* doctrine forecloses not only straightforward appeals but also more indirect attempts by federal plaintiffs to undermine state court decisions." *Id.* at 492.

In *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983), the Supreme Court held that a federal district court cannot decide *constitutional* claims that are "inextricably intertwined" with the state court's proceedings because such a ruling would essentially be a review of the state court's decision. *Feldman,* 460 U.S. at 482 n. 16. A claim is "inextricably intertwined" for purposes of the *Rooker-Feldman* doctrine if it " 'succeeds only to the extent that the state court wrongly decided the issues before it [or] if the relief requested ... would effectively reverse the state court decision or void its ruling." ' *Id.* at 1035 (quoting *Charchenko v. City of Stillwater,* 47 F.3d 981, 983 (8th Cir.1995)); *accord Neal v. Wilson,* 112 F .3d 351, 356 (8th Cir.1997). Determining whether *Rooker-Feldman* deprives the district court of subject matter jurisdiction in a given case " 'requires determining exactly what the state court held' to ascertain whether granting the requested federal relief would either void the state court's judgment or effectively amount to a reversal of its holding." *Lemonds,* 222 F.3d at 493 (quoting *Charchenko,* 47 F.3d at 983); *see also* Suzanna Sherry, *Judicial Federalism in the Trenches;* Rooker-Feldman *Doctrine in Action,* 74 Notre Dame L.Rev. 1085, 1099 (1999) (opining that the *Rooker-Feldman* doctrine applies whenever the federal district court "is in effect reviewing the state court *judgment* even if it is not reviewing the *decision"* ) (emphasis in original). [FN23]

FN23. "The prevailing view is that *Rooker-Feldman* is at least somewhat broader, or perhaps more rigid, than the state law of claim preclusion, a view that is sensibly based upon the notion that whether a state court judgment should be subject to collateral attack or review is an issue best left to the state courts." *Fielder v. Credit Acceptance Corp.,* 188 F.3d 1031, 1036 (8th Cir.1999) (citing *Kamilewicz v. Bank of Boston,* 92 F.3d 506 (7th Cir.1996), *cert. denied,* 520 U.S. 1204 (1997)).

***12** In the state criminal proceedings, the trial court refused to dismiss the charges against Yeazizw on the grounds of "discriminatory enforcement and other unconstitutionality," rejecting Yeazizw's arguments that she was singled out for enforcement or that her selection was in bad faith. The trial court further concluded that Yeazizw had not introduced any evidence to support her claim that she specifically was arrested because of her race, color, creed, or any other reason unrelated to her conduct. For its part, the jurors heard testimony from which they could have inferred that the Edina police officers had fabricated evidence and ignored Yeazizw's complaints that she was the true victim of a crime. The jurors also heard testimony from which they could have concluded that Yeazizw was suffering from a "trigger" reaction associated with post-traumatic stress disorder and lacked the intent to commit the crimes for which she was charged. The jury returned verdicts of guilty on all three counts, finding that the prosecution had met its burden of proving Yeazizw's guilt beyond a reasonable doubt.

Having evaluated what happened in Yeazizw's criminal prosecution, the Court turns to Yeazizw's federal civil rights claims. Yeazizw explains her § 1981 claim as follows:

> Yeazizw is black, and tried to assert her civil rights. She was denied those rights amid racially and ethnically-charged comments and punished through a baseless prosecution. Racially motivated misuse of governmental power falls within the ambit of § 1981, in this case for denial of full and equal benefit of all laws and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proceedings [for] the security of persons and like punishment.

(Pl.'s Mem. at 30.) Specifically, Yeazizw argues that Chief Siitari implicitly authorized, approved of, and knowingly acquiesced in the unconstitutional conduct of the Edina police officers relating to her arrest at English Rose Suites and prosecution. (*Id* .) She further contends that her complaints of racist policing "engendered such immediate hostile reactions" and set in motion "a baseless prosecution" that has haunted her for over two years. (*Id.*) As for Yeazizw's conspiracy claim under § 1985, she alleges that Officers Eidem, Kemp, and Hammond, Lieutenant Long, and Sargent Stroh-- together with Chief Siitari--conspired to fabricate evidence (including but not limited to the multiple drafts of the police report), and to "instigate[ ] a baseless prosecution against Yeazizw" that caused her to spend five days in jail. (*See* Pl.'s Mem. at 30.)

From the foregoing, it is evident that a central feature of Yeazizw's remaining federal civil rights claims is her contention that the state court prosecution against her was "baseless." Thus, to grant Yeazizw the relief she requests in her remaining federal claims, the Court would effectively have to reverse her state court conviction and void the state court's pre-trial rulings. Yet Yeazizw is simultaneously pursuing a direct appeal of her conviction in the Minnesota Court of Appeals. The unsettled nature of her state criminal conviction necessarily impacts her ability to invoke the Court's subject matter jurisdiction over the claims she has pleaded. On the record before the Court, comity requires the Court to invoke the *Rooker-Feldman* doctrine and decline to exercise jurisdiction over Yeazizw's claims under §§ 1981 and 1985. Those claims will be dismissed without prejudice for lack of subject matter jurisdiction.

III. Plaintiff's State Law Claims

***13** The Court has concluded that all federal claims over which it purportedly had original jurisdiction must be dismissed. When a district court dismisses the claims over which it has original jurisdiction, it may decline to continue to exercise what is called "supplemental jurisdiction" over the state law claims that are related to that federal claim. *See* 28 U.S.C. § 1367(c)(3); *American Civil Liberties Union v. City of Florissant,* 186 F.3d 1095, 1098-99 (8th Cir.1999) ("[W]hen state and federal claims are joined and all federal claims are dismissed ... the state claims are ordinarily dismissed without prejudice to avoid needless decisions of state law ... as a matter of comity."). In this case, Yeazizw's state law claims also implicate the validity of rulings made to date in her state criminal proceedings. Accordingly, the unsettled nature of these proceedings and questions of comity present compelling reasons for declining jurisdiction. The Court will dismiss the state law claims without prejudice.

Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, IT IS ORDERED that the Edina Defendants' Motion for Summary Judgment (Doc. No. 91) is GRANTED IN PART. Count I of Plaintiff Mebrat Belay Yeazizw's First Amended Complaint is hereby DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that the Court declines to exercise supplemental jurisdiction over the remaining Counts of the First Amended Complaint, pursuant to 28 U.S.C. § 1367(c)(3). Those claims are DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Not Reported in F.Supp.2d, 2003 WL 1966285 (D.Minn.)

**Motions, Pleadings and Filings (Back to top)**

- 0:02CV00524 (Docket) (Mar. 07, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.